UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 3:18-CR-125 JD |
| | ) |
| MAURICE SYLVESTER (03) | ) |

## OPINION AND ORDER

Police officers arrested Defendant Maurice Sylvester on November 5, 2018, when they executed a search warrant at a suspected drug house in South Bend, Indiana. Following Sylvester's arrest, officers transported him to a local police station, where a search of his person turned up $1,200 in drug money. Investigators proceeded to interview him based on his alleged connection to the house and the activities conducted there.

Sylvester faces one count of possession with conspiracy to distribute over 500 grams of methamphetamine and one count of distribution of over 50 grams of methamphetamine. [DE 17][1] He now moves to suppress the evidence obtained following his arrest, including specifically the drug money and the statements he made to police during his interview. [DE 41] He also asks the Court to suppress his entire recorded interview based on various alleged violations of his Fifth Amendment rights. [DE 42] The Court held an evidentiary hearing on these motions on March 6, 2019. [DE 75] For the reasons set forth below, the Court will grant Sylvester limited relief.

## FACTUAL BACKGROUND

Police officers working together as part of the LaPorte County Drug Task Force investigated a suspected drug distribution operation based out of a house at 601 South Illinois

---

[1] The grand jury also indicted Sylvester's codefendants, Freda Binder and Kenneth Sanders, on similar charges.

1

Street in South Bend, Indiana. Members of this task force included Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") agents, Michigan City Police Department detectives, and Indiana State Police. As part of their investigation, the officers conducted multiple controlled drug buys in late October and early November 2018. During these buys, officers performed surveillance on the house and observed Sylvester's codefendants taking part in the staged transactions. At no point did officers observe Sylvester participating in these buys.

Based on their surveillance, the officers obtained a warrant to search the house. On November 5, 2018, no more than a few minutes after consummating another drug buy with Sylvester's codefendants, the officers executed that warrant. Officers knocked on the back door, announced their presence, waited, and breached the entrance with weapons drawn. After the officers secured the kitchen and living room, three individuals emerged from the nearest bedroom with their hands raised: Kenneth Sanders (one of Sylvester's codefendants); Walter Spears; and Sylvester. The officers knew who Sanders was—they had previously seen him exit the house to hand off suspected drug packages during several of the controlled buys. The officers did not know Spears, although according to the government, Spears later informed them that his family owned the house and that he was in the process of selling it to Sanders and Sylvester. [DE 50-1 at 18] None of the officers present had identified Sylvester prior to that moment. The officers secured all three men in handcuffs.

Before even beginning their search of the house, officers noticed large quantities of drugs and drug paraphernalia throughout the house and in the open. Based on this observation, ATF Special Agent Ryan Johnson (who directed the operation) decided that Sylvester should be arrested for visiting a common nuisance. Officers then escorted Sylvester outside where a

uniformed South Bend Police Department officer patted him down, placed him in a marked car, and drove him to a local police station.

Once at the station, South Bend police conducted a more thorough body search of Sylvester and found $1,200 in controlled buy money in his underwear. Shortly thereafter, Detective John Dupont of the Indiana State Police and an unnamed ATF agent[2] interviewed Sylvester, during which they asked him about basic biographical information, advised him of his *Miranda* rights, and then proceeded to question him regarding his suspected involvement in the drug distribution ring. In total, the interview lasted just over twelve minutes.

## DISCUSSION

As stated at the outset, Sylvester now seeks to suppress the drug money found on his person, as well as his statements made to investigators during the interview. He advances two main legal arguments: first, that the officers arrested him without probable cause; and second, that the interviewing investigators violated his Fifth Amendment rights. As explained below, however, only one subset of this second argument will succeed because the interviewing officers impermissibly continued to question Sylvester after he invoked his right to remain silent. The remainder of Sylvester's arguments will not prevail.

**A.      Probable Cause to Arrest**

Sylvester first challenges whether the officers had probable cause to arrest him after executing their search warrant. He claims they did not, and so he seeks to suppress the $1,200 in drug money subsequently found in his underwear as fruit of an unlawful arrest. *See United States v. Chagoya-Morales*, 859 F.3d 411, 417 (7th Cir. 2017) ("The exclusionary rule, which permits

---

[2] This ATF agent joined Detective Dupont in conducting the investigation, however, Detective Dupont testified that he does not know the agent's name, and the agent's verbal introduction captured in the interview recording is inaudible.

trial courts to exclude unlawfully seized evidence, encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'") (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). But because ample probable cause supported Sylvester's arrest, his request will be denied.

A police officer has probable cause for an arrest if, at the time of the arrest, the "facts and circumstances within the officer's knowledge … are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009). "'[A] finding of probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime.'" *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (quoting *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003)). "Probable cause … 'is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances.'" *Jones v. City of Elkhart*, 737 F.3d 1107, 1114 (7th Cir. 2013); *Thayer v. Chiczewski*, 705 F.3d 237, 246 (2012) (quoting *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006)). In determining whether probable cause exists, a court does not evaluate "the facts as an omniscient observer would perceive them," but rather "as they would have appeared to a reasonable person in the position of the arresting officer." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006); *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008).

At the hearing, Special Agent Johnson testified that he determined Sylvester should be placed under arrest because the officers had probable cause to believe that he was committing the

Indiana state crime of visiting a common nuisance. In Indiana, a person who knowingly or intentionally visits a building, structure, or other place used for the manufacture, storage, sale, delivery, or use of a controlled substance commits visiting a common nuisance, a Class B misdemeanor. Ind. Code. §§ 35-45-1-5(a)(3), (b)(1)(C). According to Special Agent Johnson, he made the decision to arrest based on the fact that the officers saw drug paraphernalia and "pounds" of methamphetamine in the open immediately upon entering the house. That evidence, coupled with the officers' previous observations of traffic patterns at the house during the staged drug buys, led them to believe that the house was a source of drug supply—in essence, a drug house. Furthermore, Sylvester could not have been in the house without knowing that it was indeed used for the supply, sale, storage, etc. of controlled substances given the conspicuousness of the drugs, baggies, and scales. The bag of methamphetamine was situated directly to the left of the house's front door, and the drug paraphernalia was found only a few steps from the house's back door (in the kitchen). Given the location of these items near the two external doorways and the house's small size, anyone entering or occupying the house could not have ignored them. Therefore, the Court agrees that the officers had probable cause to arrest Sylvester for visiting a common nuisance. *See United States v. Bullock*, 632 F.3d 1004, 1021-23 (7th Cir. 2011) (holding officers had probable cause to arrest defendant for visiting a common nuisance under Indiana law after defendant exited a suspected drug house; subsequent search of house revealed marijuana in plain view on dining room table, such that anyone walking through the house could not have overlooked its presence).

But regardless of Special Agent Johnson's stated basis for arrest, probable cause likewise existed for him to arrest Sylvester for possession of methamphetamine—a felony in Indiana. Indeed, "[a]n arrest is constitutional if it is made with probable cause for *an* offense, even if the

5

arresting officer's stated or subjective reason for the arrest was for a different offense." *Muhammad v. Pearson*, 900 F.3d 898, 908 (7th Cir. 2018) (emphasis added and citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). In other words, Special Agent Johnson's subjective reason for arresting Sylvester "need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck*, 543 U.S. at 143.

Under Indiana law, "[a] person who, without a valid prescription or order of a practitioner acting in the course of the practitioner's professional practice, knowingly or intentionally possesses methamphetamine (pure or adulterated) commits possession of methamphetamine." Ind. Code § 35-48-4-6.1(a). A conviction for possession of methamphetamine may be supported by proof of actual or constructive possession. *Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999). Constructive possession hinges on a showing that a defendant "has both (1) the intent to maintain dominion and control and (2) the capability to maintain dominion and control over the contraband." *Id*. "The State must demonstrate the defendant's knowledge of the presence of the [methamphetamine] to prove the intent element." *Armour v. State*, 762 N.E.2d 208, 216 (Ind. Ct. App. 2002) (citing *id*.). Where, as here, the defendant does not have exclusive dominion and control over the premises that contains the contraband, this knowledge may be inferred from additional circumstances, such as: (1) incriminating statements by the defendant; (2) attempted flight or furtive gestures; (3) a drug manufacturing setting; (4) proximity of the defendant to the drugs; (5) drugs in plain view; and (6) location of the drugs in close proximity to items owned by the defendant. *Mack v. State*, 23 N.E.3d 742, 759 (Ind. Ct. App. 2014) (citations omitted). The second element (capability to control) requires a showing that the defendant "is able to reduce the controlled substance to his personal possession." *Armour*, 762 N.E.2d at 216 (citation omitted).

In *Armour*, the Indiana appellate court determined that officers had probable cause to arrest the defendant for constructive possession of cocaine. *See generally*, *id.* In that case, the defendant and two other individuals occupied a hotel room. Even though the defendant was not the registered guest assigned to the room, the arresting officer nonetheless had probable cause to arrest him after observing in plain view a crack pipe lying on the bed, a black bag with test tubes in it, plastic baggies, a white/yellow residue on the table, and a bag containing what appeared to be marijuana. *Id.* at 215. The court determined that, given the defendant's close proximity to the drugs in plain view, "he was clearly aware that the cocaine was in the room and could have reduced the cocaine to his personal possession." *Id.* at 216.

Upon entering the house here, as mentioned above, the officers were confronted by a clear, open shopping bag containing a large quantity of methamphetamine.[3] The bag was sitting on the living room couch. Next to this bag, also on the couch, was a small digital scale. In the adjacent kitchen, officers observed drug paraphernalia resting in the open atop a black microwave, including another digital scale, a measuring cup, and plastic baggies. These items, as well as the surface of the microwave, were covered in a white powdery residue. Sylvester came out of a bedroom with his hands up; the bedroom was located adjacent to the living room, mere feet from both the methamphetamine and paraphernalia. Special Agent Johnson testified that the officers observed a bag of marijuana in the open as well.

Plainly, these circumstances provided the officers with probable cause to arrest Sylvester not only for visiting a common nuisance, but also for possessing methamphetamine. Although Sylvester did not have exclusive control over the premises, the officers could infer his

---

[3] Special Agent Johnson testified that his belief that this bag contained methamphetamine was strengthened by the fact that investigators had just staged a purchase of methamphetamine sourced from that same house.

knowledge of and intent to control the methamphetamine based on his close proximity to the drugs, the drugs being in plain view, and the fact that the officers had discovered a drug manufacturing setting. *See Mack*, 23 N.E.3d at 759. And, as in *Armour*, Sylvester's close proximity to methamphetamine in plain view supports a finding that he could have reduced it to his actual possession. *See* 762 N.E.2d at 216. Thus, the officers had probable cause to arrest Sylvester for possession of methamphetamine, albeit constructive possession.

Contrary to Sylvester's overarching position, the officers did not arrest him solely because of his propinquity to illegality, which, without more, would be insufficient to support probable cause. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). Here, the officers had more. The officers observed Sylvester, Spears, and Sanders exiting a bedroom only a few feet away from large amounts of methamphetamine. This, coupled with the open nature of the drugs and paraphernalia, could lead a reasonable person to conclude that Sanders and/or Spears trusted Sylvester enough to involve him in distributing methamphetamine. *See United States v. Pace*, 898 F.2d 1218, 1239-40 (7th Cir. 1990) (rejecting defendant's reliance on *Ybarra* and finding probable cause where police observed two codefendants exiting a room in which officers found drugs and money and because homeowner trusted them "enough to have them at his home with the money and cocaine out in the open," which "could lead a reasonable person to conclude that it was reasonably probable that [the two codefendants] were involved in a large-scale cocaine deal with [the homeowner].").[4]

---

[4] *See also United States v. Nelson*, where the Seventh Circuit relied on its decision in *Pace* and held:

> The police had probable cause to arrest Nelson at Tompkins's home because, unlike *Ybarra*, the arrest here is based on more than his "mere presence" near criminal activity in a public place of lawful business. Nelson was present in a private dwelling that, with its drug paraphernalia, drug transactions, lack of furnishings and no running water, appeared to have no lawful purpose. In *United States v. Pace*, 898 F.2d 1218, 1240 (7th Cir. 1990), we rejected the defendants' argument that the police lacked probable cause to

8

Sylvester further believes the officers unlawfully arrested him because their bases for probable cause—visiting a common nuisance and/or possessing methamphetamine—do not match the offenses for which the government ultimately charged him: distribution of and conspiracy to distribute methamphetamine. This argument does not persuade the Court; indeed, it runs counter to established Circuit precedent: "'[A]n arrest may be perfectly reasonable even if the police officer ultimately does not charge the suspect for the offense giving rise to the officer's probable cause determination.'" *United States v. Burks*, 490 F.3d 563, 565 (7th Cir. 2007) (quoting *United States v. Woody*, 55 F.3d 1257, 1268 (7th Cir. 1995)). Here, the officers had probable cause to arrest Sylvester for one or more offenses. That the officers may have subsequently uncovered additional evidence leading to drug distribution charges does not retroactively erase their earlier probable cause determination. For example, the *Woody* court noted that, "[i]ndeed, many perpetrators of violent crimes are apprehended when stopped for routine traffic violations." 55 F.3d 1257, 1268. The same rationale applies to suspected drug dealers initially arrested for lesser drug offenses.

At the hearing, defense counsel additionally made a passing argument that Special Agent Johnson, as a *federal* agent, had no authority to direct the other officers to arrest Sylvester for the *state* misdemeanor of visiting a common nuisance. "Whether an officer is authorized to make an

---

> arrest them where officers executing a search warrant for a home suspected to be a site for drug-dealing observed the defendants exiting rooms in which the police found large quantities of either drugs or money out in the open. We reasoned that these observations, combined with the fact that the homeowner trusted the defendants enough to have them in his home while the money and cocaine were out in the open, could lead a reasonable person to conclude that the defendants were involved in a cocaine deal with the owner. *Id.* Here, similarly, Tompkins appeared to trust Nelson enough not to hide his drug dealing and paraphernalia, giving Nelson ready access to that paraphernalia at a private site that appeared to be a place specifically for drug dealing. These facts supported an inference that Nelson himself might be a drug customer or dealer.

385 Fed. App'x 566, 569 (7th Cir. 2010).

arrest ordinarily depends, in the first instance, on state law." *DeFillippo*, 443 U.S. at 36 (citations omitted). Indiana law authorizes federal agents to make warrantless arrests for felonies—but not misdemeanors—either committed or about to be committed (or attempted) in their presence. Ind. Code § 35-33-1-1(b). The only apparent exception to this rule is where a federal agent has been deputized by a local law enforcement officer, *id.* § 35-31.5.2.185(1)(2), but the record does not indicate as much with respect to Special Agent Johnson.

But defense counsel's argument does not impact the outcome here. As discussed above, Special Agent Johnson had probable cause to arrest Sylvester not only for the misdemeanor offense of visiting a common nuisance, but also for felony possession of methamphetamine—a crime for which Indiana expressly permits federal agents to arrest. Moreover, the Supreme Court has rejected counsel's distinction, holding that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." *Virginia v. Moore*, 553 U.S. 164, 176 (2008); *see also United States v. Brewer*, 915 F.3d 408, 414-15 (7th Cir. 2019) (citing *Moore*, confirming that "state law does not by proxy heighten the Fourth Amendment's protections," and holding that the Fourth Amendment provides no remedy for a task force's noncompliance with a state-based warrant's geographical restriction).[5] Put another way, a police officer (state *or* federal) does not violate the

---

[5] In reaching the conclusion in *Moore*, Justice Scalia explained how "linking Fourth Amendment protections to state law," as defense counsel seeks to do here, "would cause them to 'vary from place to place and from time to time.'" 553 U.S. at 176 (quoting *Whren v. United States*, 517 U.S. 806, 815 (1996)). And to illustrate these concerns, the *Moore* Court discussed a hypothetical situation directly relevant to the joint federal and state nature of the task force in this case: "Even *at the same place and time*, the Fourth Amendment's protections might vary if federal officers were not subject to the same statutory constraints as state officers." 553 U.S. at 176 (emphasis added). That is precisely the thrust of defense counsel's argument, but this "silver platter doctrine" would pose practical difficulties by imposing "more stringent limitations on federal officers than on state police acting independent of them." *Id.* (citing *Elkins v. United States*, 364 U.S. 206, 210-12 (1960)). Indeed, even though the Supreme Court

Fourth Amendment by making an arrest that is supported by probable cause on the one hand yet prohibited by state law on the other. Therefore, Special Agent Johnson's status as a federal officer has no bearing on the constitutionality of Sylvester's arrest for a state offense.[6]

The officers had probable cause to arrest Sylvester for visiting a common nuisance, or alternatively, for felony possession of methamphetamine. That federal authorities subsequently charged him as part of a conspiracy to distribute methamphetamine does not undermine the constitutional basis for his arrest, nor does the fact that a federal agent oversaw the operation and directed others to arrest Sylvester. Absent a violation of Sylvester's Fourth Amendment rights, the drug money officers later found in his underwear will not be suppressed.[7]

**B.** *Miranda*

Sylvester next argues that Detective Dupont and the unnamed ATF agent committed multiple violations of his Fifth Amendment rights while interviewing him at the police station. The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. Anyone "questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain

---

in *DeFillippo* pinned an officer's statutory authority to arrest to state law, it still made clear that "a warrantless arrest satisfies the Constitution so long as the officer has 'probable cause to believe that the suspect has committed or is committing an offense.'" *Moore*, 553 U.S. at 173 (quoting *DeFillippo*, 443 U.S. at 36)).

[6] Counsel's argument also overlooks the facts that Special Agent Johnson worked in concert with state and local police during this operation as part of a county task force, and that Sylvester was handed over to local law enforcement after being placed under arrest. The Court need not parse the impact of these details, however, given the Supreme Court's overriding holding in *Moore*.

[7] Because of this, the Court similarly will not suppress Sylvester's post-arrest statements made to police as fruit of an unlawful arrest—a prospective argument Sylvester alludes to in his briefing. [DE 41 at 10] Whether the interviewing officers violated Sylvester's Fifth Amendment rights, however, will be discussed separately.

silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).[8]

Specifically, Sylvester maintains that the officers impermissibly asked him questions before providing a *Miranda* warning and used an improper two-step interview tactic, asked him questions despite his refusal to sign a written acknowledgement of his rights, and continued to ask him questions after he unequivocally invoked his right to remain silent. As a result of these perceived violations, Sylvester seeks to suppress his entire statement provided to the officers on November 5, 2018. The Court agrees with Sylvester that any recorded statements he made after invoking his rights should be suppressed. For the following reasons, however, the Court will not suppress any portions of the interview preceding that moment.

*1. Statements Made Prior to Miranda Warning*

First, Sylvester argues that the officers impermissibly began their interview prior to advising him of his Fifth Amendment rights. A review of the interview recording, however, reveals that the officers limited their pre-*Miranda* questions to biographical information. The Seventh Circuit has squarely approved of law enforcement inquiring about such details in advance of giving a suspect his *Miranda* warnings:

> Although the defendants had not yet been given their *Miranda* warnings when they were asked these biographical questions, we do not think there was any Fifth Amendment violation, given that the sorts of questions posed (soliciting, *e.g.*, their names, birth dates and/or ages, and places of residence)—the same sorts of questions that would be posed in booking any arrested individual—are not the sort of questions that one would expect to yield incriminating information. *See United States v. Edwards*, 885 F.2d 377, 385-86 (7th Cir. 1989); *see also United States v. Westbrook*, 125 F.3d 996, 1003 (7th Cir. 1997); *United States v. Kane*, 726 F.2d 344, 349 (7th Cir. 1984).

---

[8] The parties do not dispute that Sylvester was in custody for *Miranda* purposes.

*United States v. Paxton*, 848 F.3d 803, 813 (7th Cir. 2017).[9] At the hearing, however, Sylvester's counsel pointed to a specific item asked about by the officers that he believes falls outside the realm of permitted biographical questioning: whether Sylvester goes by the nickname "Fudge." Officers asked this twice before reading Sylvester his *Miranda* rights: once at 14:45[10] and again approximately two minutes later. At no point did they ask it again. In response, Sylvester did not acknowledge going by that alias but simply stated that his name is Maurice (his legal name). Detective Dupont testified that he was not involved in the underlying investigation leading to Sylvester's arrest and that he asked this and other identifying questions as a means to verify whether Sylvester was indeed who he claimed to be.

Sylvester's concerns do not warrant suppression of his pre-*Miranda* statements. Included among the permissible biographical questions discussed by the Seventh Circuit in *Paxton* are questions relating to a defendant's nicknames:

> The requirements of *Miranda* do not attach to the taking of a defendant's aliases [during the course of booking]. The Fifth Amendment prohibits only compelled testimony, and the fact that defendant has certain identifying characteristics which police officials record does not render the disclosure of those characteristics testimonial in character. *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L.Ed.2d 908 (1966). An alias is as much an identifying characteristic as a defendant's voice or handwriting, and the Supreme Court has held that the compelled production of voice or handwriting exemplars does not violate the Fifth Amendment. *United States v. Dionisio*, 410 U.S. 1, 93 S. Ct. 764, 35 L.Ed.2d 67 (1973); *Gilbert v. California*, 388 U.S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967).

*United States v. Prewitt*, 553 F.2d 1082, 1085-86 (7th Cir. 1977); *see also United States v. Lee*, 618 F.3d 667 (7th Cir. 2010) (affirming district court's refusal to suppress defendant's answers

---

[9] In no way does *Paxton* (or any of the other cases reviewed by the Court) limit pre-*Miranda* biographical questioning simply to a suspect's legal name and date of birth, as defense counsel suggested during the hearing.

[10] This number represents the time of day as shown on the recording, and not, for example, fourteen minutes and forty-five seconds into the recording itself.

to pre-*Miranda* questions that sought information regarding his nicknames; defendant's answers contained nothing incriminating).[11] Defense counsel argues that eliciting information about the nickname "Fudge" could incriminate Sylvester based on data recovered from cell phones found at the house, but Detective Dupont had no involvement in the underlying investigation resulting in Sylvester's arrest and had only been called in that same day for the limited purpose of interviewing Sylvester; nothing in the record suggests Detective Dupont had any reason to know the significance of the nickname "Fudge."[12] In the absence of any such knowledge, asking Sylvester whether he goes by that alias produces no Fifth Amendment violation. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("The term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police *should know* are reasonably likely to elicit an incriminating response from the suspect.") (emphasis added); *see also Lee*, 618 F.3d at 677-78 ("[A] *Miranda* violation does not occur when officers question a defendant only to a limited extent for personal data required as part of the processing normally attendant to arrest

---

[11] The Seventh's Circuit's approach here is in accord with several of its sister courts. *See, e.g.*, *United States v. Brown*, No. 07-1341-cr, 2008 WL 4585325, at *3 (2d Cir. Oct. 14, 2008) (finding no *Miranda* violation where "defendant was asked a series of questions from a standard police booking form, including whether she had any nicknames or aliases," and she provided a nickname; "the fact that her answer was useful for investigatory as well as booking purposes does not render her answer inadmissible."); *United States v. Washington*, 462 F.3d 1124, 1133 (9th Cir. 2006) ("Asking about a nickname, even if it is for identification purposes, is no different from simply asking for a suspect's name. Questions about a person's identity are not unconstitutional even if identification of the person may help lead to the prosecution of that person for a crime."); *Untied States v. Fenner*, No. 93-5955, 1994 WL 637257 (4th Cir. Nov. 15, 1994) (holding that detective's questions regarding defendant's nicknames and defendant's related answers fell within the booking exception to *Miranda*).

[12] Specifically, the government believes a cell phone recovered at the house to be Sylvester's because several witnesses have apparently confirmed that he goes or went by the nickname of "Fudge," and data from multiple other cell phones recovered at the house list the contact "Fudge" in reference to this phone's number. But again, nothing in the record suggests Detective Dupont had any reason to know this. Meanwhile, Sylvester denies ownership of this phone.

and custody since these types of questions would not reasonably be expected to elicit incriminating responses.") (citing *United States v. Kane*, 726 F.2d 344, 349 (7th Cir. 1984)).

Furthermore, although Sylvester's responses to Detective Dupont's questions did not confirm that he ever used the nickname "Fudge," even *if* Sylvester answered in the affirmative, that would not suddenly create a constitutional violation out of Detective Dupont's otherwise routine biographical questions. *See United States v. Knope*, 655 F.3d 647, 652 (7th Cir. 2011) (holding police were not required to provide *Miranda* warnings to suspect before asking him where he lived, even though they obtained a search warrant based on his response which led them to incriminating evidence, because asking for his address was a proper booking question); *Lee*, 618 F.3d at 678 (Biographical questions that carry incriminatory potential "need not always be impermissible pre-*Miranda*.").

Moreover, the record here does not support a secondary and related argument raised by Sylvester: that investigators utilized an improper multi-step interview process to violate his Fifth Amendment rights. In determining whether such impermissible questioning took place, courts look to two tests set forth in *Missouri v. Seibert*, 542 U.S. 600 (2004). First, "[u]nder Justice Kennedy's intent-based test, when an interrogator uses a two-step interrogation strategy, which is predicated upon deliberately withholding *Miranda* warnings in order to get a confession, post-warning statements that are related to the substance of pre-warning statements must be excluded in the absence of specific, curative steps." *Lee*, 618 F.3d at 678 (citing *id* at 621 (Kennedy, J. concurring)). In the present case, however, there is no evidence that the interviewing officers deliberately chose to use the alleged two-step procedure to obtain a confession or other incriminating statements. *See id.* (holding police did not use improper multi-step interview

technique under Justice Kennedy's rubric where the record contained no evidence of a deliberate choice by officers to use such a procedure).

Second, under the *Seibert* plurality's test, the key question is whether "*Miranda* warnings delivered midstream could be effective enough to accomplish their object." 542 U.S. at 615. Consideration of the following factors guides this analysis: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* Under almost identical circumstances as here, the *Lee* panel held that no improper two-step questioning occurred under the plurality's test, either:

> [W]hile the first and second rounds of questions were asked consecutively without a temporal break, there was a clear division between the questions being answered for the personal-history record and the ensuing interrogation. Not only were the questions separated by the reading of *Miranda* rights, but they were different in substance since the personal-history report focused on background questions, while the post-warning interrogation focused on the details of Lee's drug-related charges.

618 F.3d at 678-79. All of the same is true in the instant case; the interviewing officers limited their pre-*Miranda* questions to biographical information, read Sylvester his rights, and then noticeably switched gears to focus on his connection to the drug house.

Overall, the absence of any incriminatory response from Sylvester as to whether he even goes by "Fudge" calls into question the applicability of his secondary argument altogether. As the plurality in *Seibert* noted, the whole point of a two-step interrogation "is that with one confession in hand before the warnings the interrogator can count on getting its duplicate, with trifling additional trouble." 542 U.S. at 613. Here, the officers obtained nothing but biographical information while questioning Sylvester before reading him his rights. Absent evidence that

16

Sylvester made any incriminatory statements before receiving his *Miranda* warning, Sylvester's secondary argument carries little weight. *See Lee*, 618 F.3d at 679.

For these reasons, the Court will deny Sylvester's request to suppress his interview statements made prior to when Detective Dupont advised him of his Fifth Amendment rights.

*2. Statements Made After Miranda Warning*

Sylvester next argues that his post-*Miranda* statements should be suppressed because he did not waive his Fifth Amendment rights. A defendant's "statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived Miranda rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (citation and alteration omitted). Knowing waiver requires "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. (citation omitted).

Based on the interview recording, the officers confirmed that Sylvester could read and write in the English language, and Detective Dupont read Sylvester his *Miranda* advisement from a form at 14:48. Sylvester acknowledged verbally that he understood his rights at 14:49, but then declined to put his signature on the form. The officers recognized that Sylvester did not wish to sign the form, but still asked, "You're still good with talking to us?" Sylvester responded, "Yeah, I mean …," shrugged his shoulders, and slightly nodded his head in the affirmative. He then proceeded to answer two full minutes' worth of questions posed by the officers, up until telling them, "I don't wanna answer no questions." Based on Sylvester's conduct and discourse with the officers, the Court concludes that he waived his Fifth Amendment rights up until the point where he declared that he did not want to answer any more questions. "Willingness to answer questions, even in the absence of a signed waiver, can be

viewed as impliedly waiving one's rights." *Lee*, 618 F.3d at 676; *see also United States v. Smith*, 218 F.3d 777, 781 (7th Cir. 2000) (holding that "a *Miranda* waiver need not be express. It may be inferred from a defendant's understanding of her rights coupled with a course of conduct reflecting her desire to give up her right to remain silent").

Here, although he refused to sign the *Miranda* form, Sylvester expressed a willingness to talk with the officers and indeed proceeded to answer multiple questions thereafter. Therefore, the statements made during this portion of Sylvester's interview will not be suppressed. *See United States v. Terry*, 915 F.3d 1141, 1146 (7th Cir. 2019) (holding defendant did not waive his Fifth Amendment rights where he acknowledged understanding those rights, refused to sign *Miranda* form, gave verbal indication that he was willing to talk, and proceeded to answer agents' questions; noting that *Berghuis* squarely foreclosed argument for waiver under these circumstances); *see also United States v. Stewart*, 902 F.3d 664, 678-79 (7th Cir. 2018) (holding that even where a person appears to nod in the negative but then continues to talk, officers need not cease questioning).

      *3. Statements Made After Invoking Right to Silence*

This brings the Court to Sylvester's third Fifth Amendment challenge, that the interviewing officers impermissibly continued questioning him after he made an unambiguous invocation of his right to remain silent. As stated above, shortly after 14:52, Sylvester told the officers, "I don't wanna answer no questions." Detective Dupont then asked, "You don't want to answer any questions?" and Sylvester responded in the negative with "hmm-mm" and by shaking his head "no." Despite this exchange, the officers continued to interview Sylvester (or at least attempted to interview him) for another four minutes. The government conceded at the hearing that Sylvester unambiguously invoked his right to silence and that the questioning should

have ceased immediately thereafter. *See Bobo v. Kolb*, 969 F.2d 391, 396 (7th Cir. 1992) ("Once a suspect has exercised his right to silence, the police must abide by this decision and end the interrogation."). Therefore, any statements made after this point in the interview recording will be suppressed.

## CONCLUSION

For all these reasons, the Court **GRANTS** Sylvester's request to suppress the portion of his recorded interview that occurred following the unambiguous invocation of his right to remain silent. The Court **DENIES** all other requested relief contained in his two motions to suppress. [DE 41; DE 42]

SO ORDERED.

ENTERED: April 9, 2019

          /s/ JON E. DEGUILIO
Judge
United States District Court